STATE of Missouri, Office of Administration, et al., Appellants,

v.

NATIONWIDE LIFE INSURANCE CO., et al., Respondents.

No. WD 72383.

Missouri Court of Appeals, Western District.

March 8, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 3, 2011.

Application for Transfer Denied June 28, 2011.

---

James R. Layton, Peggy A. Whipple, Mark E. Long, Jennifer Redel–Reed, Jefferson City, MO, for appellants.

James B. Deutsch, Marc H. Ellinger, and Thomas W. Rynard, Jefferson City, MO, for respondents.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JAMES E. WELSH, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

This dispute arises out of Nationwide Life Insurance Co.'s ("Nationwide") withholding of an $18,586,379.65 market value adjustment ("MVA") from the State's deferred compensation fund assets transferred by Nationwide to a new investment provider on June 2, 2006. The State of Missouri, Office of Administration, and Missouri State Employees Deferred Compensation Commission (collectively hereinafter referred to as "the State") filed suit against Nationwide and National Retirement Systems f/k/a PEBSCO ("NRS") for breach of contract, for breach of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty. On February 16, 2010, the trial court entered summary judgment in favor of Nationwide and NRS on all six counts of the State's petition and denied the State's competing motion for partial summary judgment ("Judgment"). The State timely filed this appeal.

The State contends that the trial court erred in granting summary judgment in favor of Nationwide and NRS because: (1) the undisputed facts support a finding that the investment provider contract ("IP Contract") between the State and Nationwide, which expired by its terms on December 31, 2005, nonetheless controlled the parties' rights and obligations as of June 2, 2006, and did not authorize Nationwide to withhold an MVA; (2) the trial court erroneously concluded as a matter of law that a fixed annuity contract ("Fixed Contract") between the State and Nationwide survived the December 31, 2005 expiration of the IP Contract and independently permitted Nationwide to withhold an MVA; (3) the undisputed facts support a finding that Nationwide breached the implied covenant of good faith and fair dealing by unilaterally attempting to resurrect MVA provisions from the IP Contract that were "deleted and replaced" by an amendment to the IP Contract; (4) assuming, arguendo, that Nationwide appropriately withheld an MVA adjustment, there are genuine issues of material facts in dispute regarding how

the MVA was calculated; and (5) the undisputed facts show that NRS breached its third party administrator contract with the State by failing to procure an extension of the IP Contract from Nationwide prior to December 31, 2005.

We affirm the trial court's Judgment in part and reverse the trial court's Judgment in part. We remand this matter with instructions directing the trial court to vacate its Judgment and to enter a new judgment as herein directed.

### Factual and Procedural History

The State established the Missouri State Employees Deferred Compensation Plan ("Plan") pursuant to its statutory authority under section 105.900 (RSMo 1974).[1] NRS and the State entered into a contract appointing NRS the third party administrator for the Plan in 1978 ("TPA Contract"). The TPA Contract was periodically renewed and amended. The TPA Contract appointed NRS as the "exclusive coordinator, administrator, and marketer" of the Plan. The TPA Contract obligated NRS to assist the State by designing and drafting amendments to the Plan and its attendant agreements.

### Request for Proposal for an Investment Provider—the IP Contract

On November 10, 1995, the State issued a Request for Proposal ("RFP") for an investment provider for the Plan. The RFP anticipated that the successful bidder would be awarded the IP Contract, the terms of which would be the terms in the RFP as modified by the successful bidder's responding bid document. Nationwide[2] was the successful bidder and was thus awarded the IP Contract.

The terms of the IP Contract, the manner in which those terms were amended,

and the relationship between the IP Contract and the Fixed Contract, are central to the disposition of this case. This is because the trial court entered its Judgment premised on either (i) the legal theory that the Fixed Contract was a wholly separate contract from the IP Contract such that an MVA provision in the Fixed Contract became independently enforceable upon expiration of the IP Contract; or (ii) the legal theory that although amendments to the IP Contract expired, the original terms of the IP Contract, including the original MVA provisions, remained in force and effect; or (iii) the legal theory that Nationwide and the State entered into a new contract after the IP Contract expired agreeing to operate under the Fixed Contract. To determine whether the trial court properly applied the law in defining and enforcing the legal relationship between the State and Nationwide, we are required to engage in a tedious discussion of the dispositive provisions of the RFP.

The RFP provided in PART A: REQUEST FOR PROPOSAL (a section to be completed by a Proposing Company) that any "Proposing Company" would "place a check mark in the following space(s) for the product(s) offered by the Company." The products available to be check marked were (1) variable group annuity and (2) fixed group annuity. PART A included a signature block for the Proposing Company, which was preceded by the following statement: "We hereby agree to furnish products described above *in accordance with the provisions in the attached proposal.*" (Emphasis added.) Nationwide placed a check mark next to both the variable group annuity and the fixed group annuity products. Nationwide signed

---

1. All statutory references are to RSMo 2000 as supplemented unless otherwise noted.

2. NRS is a wholly owned subsidiary of Nationwide.

PART A, and thus agreed to furnish these products *in accordance with the provisions of the RFP.*

PART B: NOTICE OF AWARD (which was to be completed by the State) provided in pre-printed text "[a]cceptance, with the following provisions or restrictions." PART B anticipated that a Proposing Company's responsive bid could propose modifications to the provisions of the RFP. Nationwide's responsive bid did propose modifications to the RFP. Some of the proposed modifications were accepted by the State and some were not. In awarding the RFP (and thus the IP Contract) to Nationwide, the State completed PART B as follows:

I. *This contract is effective June 1, 1996 for a period of 3 years.*

II. In order to resolve any ambiguities or discrepancies in the contractual requirements contained in the RFP and the responses made to those requirements the parties agree to the terms contained in Attachment A with respect to paragraphs III.A.4, 5, 6, 7, 32, IV.B.4, and 7. The terms contained in Attachment A constitute the parties' agreement and supercede [sic] the language contained in the RFP and the responses with respect to the designated paragraphs.

(Emphasis added.) Thus, Attachment A was used to address changes proposed by Nationwide's responsive bid which required further negotiation before being acceptable to the State. Unless addressed in Attachment A, other changes to the RFP proposed by Nationwide were accepted by the State as reflected by the State's acceptance of Nationwide's bid.

The provisions in Attachment A of relevance to this case are the agreed modifications to paragraphs III.A.4, III.A.6, and III.A.7 of the RFP. Paragraph III of the RFP is entitled CONTRACTUAL REQUIREMENTS and required the Proposing Company to specify in its responsive bid "whether it accepts or rejects each of the following requirements."

In paragraph III.A.4, the RFP provided that a Proposing Company would:

[A]gree that the contract between the [State] and the Company shall consist of (1) the provisions of this Request for Proposal and amendment, attachments or exhibits thereto; and (2) the Contractor's proposal submitted in response to the Request for Proposal. In the event of a variance in language between the two documents referenced above, the terms of the Request for Proposal shall govern.

Nationwide agreed to the first sentence of this provision without modification, and thus agreed that *its "contract" with the State consisted of the provisions of the RFP and amendments, attachments and exhibits thereto.*[3]

In paragraph III.A.6, the RFP had provided that a Proposing Company would "agree that no fees and/or charges will apply if the contract is *terminated for cause.*" (Emphasis added.) Nationwide and the State agreed to modify this provision, as indicated in Attachment A, to provide that "Nationwide agrees, however, *a market value adjustment may apply depending on the method of withdrawal.*" (Emphasis added.)

In paragraph III.A.7, the RFP had provided that a Proposing Company would "agree to allow the [State] at the *expira-*

---

**3.** Nationwide and the State agreed to a modification of the second sentence of this provision that is not set forth in this Opinion because it is not particularly relevant to the disposition of this case. The modification to the second sentence explains, however, the provision's inclusion in Attachment A.

*tion of the contract term* the right to withdraw the assets from the contract(s) in a lump sum." (Emphasis added.) Nationwide and the State agreed to modify this provision, as indicated in Attachment A, to provide that "Nationwide agrees, however *a market value adjustment may apply depending on the method of withdrawal.*" (Emphasis added.)

Though Nationwide and the State agreed, as noted in the modified versions of paragraphs III.A.6 and III.A.7, that a market value adjustment might apply upon *expiration* or *other termination* of the contract "depending on the method of withdrawal" of assets, neither paragraph explained what method of withdrawal would trigger an MVA. "Method of withdrawal" necessarily referred, however, to the State's withdrawal of assets on deposit with Nationwide in either the variable annuity product or the fixed annuity product—products Nationwide was agreeing to permit the State to use "*in accordance with the provisions of the RFP.*"

Additional provisions of the RFP (and of Nationwide's responses thereto) not addressed in Attachment A are also relevant to the disposition of this case. They are paragraphs III.A.1, III.A.24, IV.B.3, IV. B.12, and IV.B.13.

In Paragraph III.A.1, the RFP provided in pertinent part that the Proposing Company shall "provide proposals for one or more of the products described in Section IV for a period of three years, commencing June 1, 1996." Nationwide accepted this provision and specifically advised that it was "pleased to present to the State of Missouri an offering of the Nationwide Life Insurance Company Governmental Plans Group Fixed (GPFA) and Variable (GPVA) Fund Retirement Contracts for

both the 457 and 401(a) Programs. *The contract term will be for three years beginning June 1, 1996.*" (Emphasis added.) As previously noted, PART B of the RFP had also indicated that "*this contract is effective June 1, 1996 for a period of 3 years.*" Nationwide and the State thus agreed, as expressed in PART B and in Paragraph III.A.1 of the RFP, that their "contract," including, specifically, the two annuity products addressed in paragraph III.A.1, would have a three year term.

In paragraph III.A.24, the RFP provided that the Proposing Company would "agree to maintain separate group contracts in the name of the 'State of Missouri Public Employee's Deferred Compensation Plan' and 'Missouri State Employees' Deferred Compensation Incentive Plan' with individual sub-account records for each participant within each Plan." Nationwide agreed with this provision and further provided that "*[a] specimen of these Annuity Contracts is provided in Section VI, Exhibit B.*" (Emphasis added.) The variable annuity product was Nationwide Form APO–2355. The Fixed Contract was Nationwide Form APO–2424. The two annuity product contracts were thus "exhibits" to the RFP. Per Attachment A, paragraph III.A.4 of the RFP, the exhibits were an agreed part of the *parties' "contract," which consisted of the provisions of the RFP and amendments, attachments and exhibits thereto.*

The RFP addressed terms the State required to be incorporated into the two annuity product contracts. These terms were described in paragraph IV of the RFP, entitled INVESTMENT OPTIONS. Two "Plans" (or products) are discussed in paragraph IV. Subparagraph A is entitled VARIABLE ANNUITY.[4] Subparagraph

4. The RFP never envisioned that an MVA could be withheld from funds deposited pur-

suant to the variable annuity product. Nationwide did not withhold an MVA from the

B is entitled FIXED DOLLAR ANNUITY PRODUCTS. These were the products identified in PART A of the RFP as the products Nationwide agreed to provide *"in accordance with the provisions"* of the RFP.

In paragraph IV.B.3, which was applicable to the Fixed Contract, the RFP provided that the Proposing Company should:

> [D]escribe fully all matters related to the issuance, maintenance and administration of the contract, including minimum contribution levels, loading costs, administrative fees, policy fees, surrender charges, actuarial charges, and asset fees. Note specifically whether charges apply to the contribution base or to the sub-account values and at what time charges are taken against the account(s).

In response, Nationwide stated in pertinent part:

> Upon the direction by the State of Missouri to withdraw assets in a lump sum, *a market value adjustment may be incurred. The market value adjustment is the amount, which [Nationwide] determines in accordance with its then current procedures applicable to all Annuity Contracts of this type and class, would be the net capital loss, if any, resulting to [Nationwide] if investments were liquidated to satisfy the lump sum withdrawal.* The then current [Nationwide] procedures for determination of the market value adjustment will be provided to the State of Missouri on request.

(Emphasis added.)

In paragraph IV.B.12, which was applicable to the Fixed Contract, the RFP provided that the Proposing Company should

"describe fully *the right of [Nationwide] to terminate and amend the group contract(s)* and the effect of such action on existing participants in each case." In a lengthy response, Nationwide stated in pertinent part:

> The State of Missouri may suspend the Annuity Contract(s) by giving ninety (90) days written notice to [Nationwide]. Suspension of the Annuity Contract(s) will mean only that no further contribution will be accepted by [Nationwide], except by mutual consent. All other terms of the Annuity Contract(s) will continue to apply.

> At any time after suspension of these Annuity Contract(s) has become effective, the State may, on thirty (30) days written notice, terminate the Annuity Contract(s).... Ninety (90) days after the effective date of termination of the Annuity Contract(s), [Nationwide] will pay the State, at the State's option, the balance of all Participant Accounts, in one of the following two (2) forms:

> . . . .

> (b) Lump Sum

>> On termination of the Annuity Contract, the State may direct that all or part of the amounts held under the Annuity Contract be withdrawn in a lump sum. *In such case, [Nationwide] will pay to the State the amounts withdrawn less the amount of the market value adjustment. The market value adjustment is the amount which [Nationwide] determines, in accordance with its then current procedures applicable to all Annuity contracts of this type and class, would be the net capital*

---

funds deposited pursuant to the variable annuity product. The MVA withheld by Nationwide in this case was withheld only from the funds deposited pursuant to the Fixed Con-

tract. We will thus focus our discussion on the terms of the IP Contract addressing the Fixed Contract.

*loss, if any, resulting to [Nationwide] if investments were liquidated to make the lump sum withdrawal.* The then current procedures for determination of the market value adjustment will be provided to the State of Missouri upon request.

(Emphasis added.)

In paragraph IV.B.13, the RFP provided that the Proposing Company should "describe withdrawal conditions, including surrender penalties, *in the event the group annuity contract(s) are terminated by the State.*" Nationwide's response was in all material respects identical to Nationwide's response to paragraph IV.B.12 noted above, including the discussion of an MVA in the event of the State's withdrawal of assets from the Fixed Contract by a lump sum.

Nationwide's responses to paragraphs IV.B.3, IV.B.12, and IV.B.13 thus provided the "specifics" with respect to how "the method of withdrawal" referenced in paragraphs III.A.6 and III.A.7 could result in an MVA. Combining the provisions, Nationwide was permitted to withhold an MVA from the funds under the Fixed Contract, calculated using then current procedures employed by Nationwide for similar fixed annuity products, if, *upon expiration of the contract term* (discussed in paragraph III.A.7), *or upon other termination of the contract* (discussed in paragraph III.A.6), the State requested withdrawal of the funds held pursuant to the Fixed Contract in a lump sum.

*Renewals/Amendments of the IP Contract*

In May 1998, the State and Nationwide entered into a renewal agreement (the "Renewal Agreement"). The Renewal Agreement provides in its introductory paragraph:

WHEREAS, [the State], through the terms of Request for Proposal and Award B600462 ("Request"), and Nationwide through its Response thereto ("Response"), *have collectively formed an Agreement ("Agreement") in which the parties have agreed to certain terms and conditions which provide for the use of Nationwide's* Governmental Plans Variable Group Annuity Contract (APO–2355, hereinafter referred to as *"Flexible Contract"*) *and* Governmental Plans Fixed Group Annuity Contract (APO–2424, hereinafter referred to as *"Fixed Contract"*) to fund both the State of Missouri Deferred Compensation Program and the Missouri State Employees' Deferred Compensation Incentive Plan; . . .

(Emphasis added.) The Renewal Agreement defined "Agreement" as the collective understanding represented by the RFP and Nationwide's response describing the terms and conditions for the State's use of the two annuity products. The Renewal Agreement acknowledged that the "Agreement" was due to expire according to its terms on or about June 1, 1999. This understanding was consistent with PART B and paragraph III.A.1 of the RFP, where the parties had expressed that their "contract," including, specifically, the two annuity products, would have a three year term.

The State and Nationwide agreed in the Renewal Agreement to "extend the term of the duties and obligations of the Agreement by adding the following to PART B: NOTICE OF AWARD, Section I. of the Request: 'Effective May 1, 1998, the duties and obligations of the parties shall be extended and shall remain in effect through June 1, 2003.'"

No other document was ever executed by the parties to separately extend the term of the two annuity product contracts.

Yet the two annuity product contracts continued in force beyond their initial termination date of June 1, 1999. The Renewal Agreement's use of the word "Agreement" was thus necessarily intended to encompass the IP Contract and each of the annuity product contracts. Thus, the Renewal Agreement's extension of the term of the "Agreement" to June 1, 2003, had the effect of extending the stated term of the IP Contract and of each of the annuity product contracts, including the Fixed Contract.

Consistent with the parties' intent that the reference to "Agreement" encompassed the annuity product contracts, the Renewal Agreement and subsequent amendments thereto were routinely used to amend the specific terms of the annuity product contracts. For example, the Renewal Agreement "deleted and replaced" language from paragraph III.A.1 of the RFP addressing the cost of the variable annuity product. The Renewal Agreement also discussed the possibility that the State might enter into a contract with a single source record keeper to assume plan administration, which would require Nationwide to assist with conversion of the Fixed Contract and the variable annuity product contract to unallocated annuity contracts.

Finally, the Renewal Agreement provided that "[a]ll other terms, conditions, duties and obligations *of the Agreement* shall remain in full force and effect." (Emphasis added.)

On March 1, 1999, the State and Nationwide entered into a first amendment to the Renewal Agreement ("First Amendment"). The First Amendment included a nearly identical prefatory paragraph as had appeared in the Renewal Agreement. In the First Amendment, the parties once again "deleted and replaced" the language in paragraph III.A.1 of the RFP, as amended by the Renewal Agreement, to reflect an agreed reduction in the cost of the variable annuity product. The First Amendment provided that "[a]ll other terms, conditions, duties and obligations of the Renewal Agreement and the Agreement shall remain in full force and effect."

Also on March 1, 1999, the State and Nationwide replaced Nationwide Form APO–2424 (the original Fixed Contract form) with Nationwide Form APO–2425. No explanation for the substitution of forms has been provided by the parties. Certainly, the record includes no uncontroverted facts suggesting the parties intended the substituted form of Fixed Contract to be immune from, and thus a separate and distinct contract from, the requirements of the RFP. In fact, in every respect, Form APO–2425 reflected the terms the State had required be included in the Fixed Contract. For example, Article 6.2(b) of Form APO–2425 addressed suspensions and terminations, describing the State's right to elect a lump sum withdrawal of assets subject to an MVA, all in the manner set forth in Nationwide's response to paragraphs IV.B.12 and IV.B.13 of the RFP.

On June 8, 2000, the State and Nationwide entered into a second amendment to the Renewal Agreement ("Second Amendment"). The Second Amendment included a nearly identical prefatory paragraph as appeared in the Renewal Agreement. The Second Amendment again reflected an agreed reduction to the cost of the variable annuity product, and did so by the parties' agreement to "delete and replace" language in paragraph III.A.1 of the RFP.

*Amendments Involving the MVA*

On February 24, 2003, Nationwide sent a letter to the State proposing a new methodology for determining the MVA for the Fixed Contract. The proposed methodology tied Nationwide's right to an MVA to the Lehman Baa Credit Index, and specifi-

cally proposed that *no MVA would apply* if the Index was below 8.00%. If the Index was above 8.00%, the proposal articulated a means of calculating the MVA that required comparing the market value of the assets attributable to the Fixed Contract with the account value of the assets.

In response to this proposal, Nationwide and the State agreed to amend the MVA provisions and to extend the term of their "Agreement." Importantly, the parties did so on June 1, 2003, by a third amendment to the Renewal Agreement ("Third Amendment"). The parties did *not* enter in to a document separately amending the Fixed Contract, evidencing that the substitution of Form APO–2425 had no effect on the parties' intent that the Fixed Contract, albeit now in a substituted form, remained a part of their collective "Agreement" from and after March 1, 1999.

The Third Amendment evidenced this intent, and provided:

WHEREAS, [the State], through the terms of the Request for Proposal and Award B600462 ('Request'), and Nationwide through its Response thereto ('Response'), have collectively formed an agreement commencing on June 1, 1996, as amended by the Renewal Agreement dated May 1, 1998, by that certain First Amendment dated March 1, 1999, and by that certain Second Amendment dated June 8, 2000 (*hereinafter collectively referred to as 'Agreement'*); and

WHEREAS, [the State] and Nationwide *desire to extend the term of the Agreement through May 31, 2004;* and

WHEREAS, [the State] and Nationwide *desire to further amend their respective rights and responsibilities under the Agreement;*

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

1. The parties hereby extend the term of the duties and obligations of the Agreement by adding the following to PART B: NOTICE OF AWARD, Section I. of the Request:

'Effective June 1, 2003, the duties and obligations of the parties shall be extended and shall remain in effect through May 31, 2004.'

. . . .

4. Effective June 1, 2003, Nationwide's reply to [paragraph] III.A.7 *is hereby deleted and replaced* as follows:

'Agreed. *Upon expiration of the contract term,* the State may direct that all or part of the amounts held under the Annuity Contract(s) be withdrawn in a lump sum. . . . With respect to the GPFA Annuity Contract(s) [the Fixed Contract], the State shall give to [Nationwide] no later than thirty (30) days prior to the expiration of the contract term, written notice as to the payment option it is selecting. In the case that the State has selected that all or part of the amounts held in the [Fixed Contract] be withdrawn in a lump sum, Nationwide will pay to the State the amounts withdrawn from the [Fixed Contract] *less the amount of the market value adjustment, if any. The market value adjustment is the amount determined in accordance with the methodology set forth in Exhibit "A," attached hereto and incorporated by reference herein, which is applicable solely to the GPFA Annuity Contract(s) (APO–2425)* issued to and owned by the State.'

. . . .

7. Effective June 1, 2003, the third and fourth paragraphs of Nationwide's reply to [paragraph] IV.B.3 of the Response *is hereby deleted and replaced* as follows:

'Upon the direction by the State of Missouri to withdraw assets in a lump sum, *a market value adjustment may be incurred. The market value adjustment is the amount determined in accordance with the methodology set forth in Exhibit "A," attached hereto and incorporated by reference herein, which is applicable solely to the GPFA Annuity Contract(s) (APO–2425)* issued to and owned by the State.'

. . . .

8. Effective June 1, 2003, Nationwide's reply to Sections IV.B.12 and IV. B.13 of the Response *is hereby deleted and replaced* as follows:

'The State of Missouri *may terminate* the GPFA Annuity Contract(s) [Fixed Contract] by giving ninety (90) days written notice to [Nationwide]. Upon receipt of written notice of termination, no further contributions to the GPFA Annuity Contract(s) will be accepted by [Nationwide], except by mutual consent. No later than thirty (30) days before the termination becomes effective, the State shall give [Nationwide] written notice as to the payment option it is selecting.

Upon termination of the GPFA Annuity Contract(s), [Nationwide] will pay to the State, pursuant to the option selected by the State, the balance of all Participant Accounts, in one of the following two (2) forms:

. . . .

(b) Lump Sum

In the case that the State has selected that all or part of the amounts held in the GPFA Annuity Contract(s) be withdrawn in a lump sum, [Nationwide] will pay to the State the amounts withdrawn *less the amount of the market value adjustment. The market value adjustment is the amount determined in accordance with the methodology set forth in Exhibit "A" attached hereto*

*and incorporated by reference herein, which is applicable solely to the GPFA Annuity contract(s) (APO–2425)* issued to and owned by the State.

[Nationwide] may amend the Annuity Contract(s) when, in the opinion of [Nationwide], an amendment is necessary to protect [Nationwide] from adverse financial impact due to an amendment to or modification of the Plans, changes in administrative practices adhered to by the Plans, changes in Investment Options offered by the Plans, or the action of legislative, judiciary, or regulatory body which impacts the Annuity Contract(s).

Such amendment shall not be effective until [Nationwide] provides written notice to the State of [Nationwide's] intent to amend the Annuity Contract(s) and the State provides its consent, such consent shall not be unreasonably withheld by the State.'

. . . .

9. All other terms, conditions, duties and obligations of the Agreement shall remain in full force and effect.

(Emphasis added.)

Exhibit "A" referenced in the Third Amendment expressly advised that it:

[S]ets forth the methodology for determining a market value adjustment ("MVA") with respect solely to the Governmental Plans Fixed Group Annuity Contract (APO–2425) issued by Nationwide Life Insurance Company to the State of Missouri Deferred Compensation Plan effective March 1, 1999 and the Governmental Plans Fixed Group Annuity Contract (APO–2425) issued by Nationwide Life Insurance Company to the Missouri State Employees' Deferred Compensation Incentive Plan effective March 1, 1999 (hereinafter collectively

referred to as the "GPFA Annuity Contract(s)").

Exhibit "A" to the Third Amendment continued to describe the newly agreed upon methodology for calculating an MVA, if any, should the State request a lump sum withdrawal of the Fixed Contract Assets. *The methodology is virtually identical to the methodology Nationwide proposed in its letter to the State dated February 24, 1999.* Exhibit "A" went on to provide:

Effective June 1, 2003 through May 31, 2004, as long as the Lehman Baa Credit Index is below 8.00% no MVA would apply. In the event the Lehman Baa Credit Index is above 8.00%, any possible MVA would be calculated as follows:

- If the Market Value of the assets attributed to the GPFA Annuity contract(s) is greater than or equal to the Account value, then no MVA would apply.
- If the Market Value of the assets attributed to the GPFA Annuity contract(s) is less than the Account Value, then the Market Value of these assets would be the amount available for a lump sum withdrawal.

The June 1, 2003 through May 31, 2004 "effective" date for the newly agreed upon methodology for calculating an MVA is co-extensive with the renewal term for the parties' "Agreement" set forth in the Third Amendment.

The Third Amendment thus extended the *stated term* of the "Agreement" to May 31, 2004. Once again, no other document was signed by the parties extending the stated terms of the annuity product contracts. But for the application of the Third Amendment to the annuity product contracts, the annuity product contracts would have expired on June 1, 2003. It is uncontested that the annuity product contracts did not expire on that date. This once again unambiguously indicates that the parties' intended the Third Amendment's reference to "Agreement" to include the IP Contract and the two annuity product contracts, such that the Third Amendment's extension of the term of the "Agreement" extended the term of each of these contracts.

The intended application of the Third Amendment to both the IP Contract and the annuity product contracts is also reflected by the Third Amendment's express discussion of the annuity product contracts. The Third Amendment and Exhibit "A" thereto amended the MVA provisions in the IP Contract and *in the Fixed Contract entered into on March 1, 1999, (APO–2425),* specifically referencing the Fixed Contract Form which was substituted for Form APO–2424 on March 1, 1999.

Paragraph III.A.7 of the RFP, which had addressed the State's right to withdraw the assets in the Fixed Contract in a lump sum *upon expiration of the contract,* was materially revised by the Third Amendment. Paragraphs IV.B12 and IV.B.13, which had addressed the State's right to withdraw the assets in the Fixed Contract *upon other termination* of the Fixed Contract by either Nationwide or the State, was also materially revised by the Third Amendment. The revisions to each of these paragraphs were essentially identical and had the effect of permitting the State to withdraw funds from the Fixed Contract in a lump sum *either* upon *expiration* of the term of the contract *or* upon *other termination* of the contract, subject to Nationwide's markedly limited right to withhold an MVA subject to the Lehman Baa Credit Index. In fact, these revisions reflected the parties' agreement that under certain circumstances, no MVA could be withheld by Nationwide.

To reflect these revisions, the Third Amendment specifically noted that the ef-

fected paragraphs (Paragraphs III.A.7, IV. B.12, and IV.B.13) were *"deleted and replaced"* by the newly agreed upon MVA language.

On June 1, 2004, the State and Nationwide entered into a fourth amendment to the Renewal Agreement ("Fourth Amendment"). The Fourth Amendment provided:

> WHEREAS, [the State], through the terms of the Request for Proposal and Award B60042 ('Request'), and Nationwide through its Response thereto ('Response'), have collectively formed an agreement commencing on June 1, 1996, as amended by the Renewal Agreement dated May 1, 1998, and three subsequent amendments (hereinafter collectively referred to as 'Agreement'); and
>
> WHEREAS, [the State] desires to extend the term of the Agreement through December 31, 2005 or such time as [the State] completes the Request for Proposal (RFP) process for the services provided herein and the contracts resulting from the RFP take effect;
>
> NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:
>
> 1. The parties hereby extend the term of the duties and obligations of the Agreement by adding the following to PART B: NOTICE OF AWARD, Section I. of the Request:
>
> 'The duties and obligations of the parties shall be extended and shall remain in effect through December 31, 2005 or such time as [the State] completes the RFP process for the services provided herein and the contracts resulting from the RFP take effect—whichever date is earlier.'
>
> 2. The second paragraph of Exhibit A is hereby *deleted and replaced* as follows:

> 'Any possible MVA would be calculated as follows:
>
> ● If the Market Value of the assets to the GPFA Contract(s) is greater than or equal to the Account Value, then no MVA would apply.
>
> ● If the Market Value of the assets attributed to the GPFA Contract(s) is less than the Account Value, then the Market Value of these assets would be the amount available for a lump sum withdrawal.
>
> Effective June 1, 2004 through December 31, 2005, as long as the Lehmann Baa Credit Index is below 8.00%, no MVA would apply.
>
> The remaining provisions of Exhibit A shall remain unchanged.'
>
> 3. All other terms, conditions, duties and obligations of the Agreement shall remain in full force and effect.

(Emphasis added.)

The Fourth Amendment again extended the terms of the parties' "Agreement" to December 31, 2005, and slightly (nearly imperceptibly) adjusted the Third Amendment's agreed methodology for calculating a MVA, if any, upon the State's withdrawal of the funds in the Fixed Account in a lump sum upon either the *expiration or other termination* of the parties' contract.

At the time of the Fourth Amendment, the State intended to re-let the investment provider contract, a process it had not undertaken since the initial RFP in 1995. Nationwide was aware of this fact when it entered into the Fourth Amendment. A new RFP was issued on June 15, 2005, with a response date of July 20, 2005. The new RFP anticipated a new investment provider contract would be awarded with a term through May 31, 2011. The new RFP thus necessarily announced the obvious—the State intended to permit the parties' contract (the IP Contract and the

annuity product contracts) to expire by their terms on December 31, 2005. Nationwide submitted a bid in response to the new RFP, apparently hoping it would be awarded the new investment provider contract.

### Transition of Assets to New Investment Provider

Though Nationwide submitted a bid in response to the new RFP, Nationwide was not the successful bidder. On December 13, 2005, in an internal email, Joe Buck with Nationwide advised others at Nationwide:

> It appears that Missouri *is not going to renew our contract that expires Dec. 31, 2005.* They have about $480 million in our general account in Pool 303–013. The contract requires that they give us written notice and a 90–day window to raise the cash. I would expect that this cash will leave the Life Company somewhere between March and June 2006. I don't know any of the details of why they chose not to renew. Let me know if you have any other questions. I will pass on details as I hear them.

(Emphasis added.) Nationwide was thus aware that the IP Contract and the annuity product contracts, *including the Fixed Contract, were set to expire by their terms* on December 31, 2005, as had been reflected by the parties' agreement in the Fourth Amendment. As previously noted, the Third Amendment had "deleted and replaced" paragraph III.A.7 of the RFP, addressing *expiration* of the contract term. Revised paragraph III.A.7 provided that the State would give Nationwide *ninety days notice of its intent to let the contract term to naturally expire.* The State did that, having advised Nationwide more than ninety days before the expiration of the parties' contract term that the State intended to let the contract term expire, as evidenced by the new RFP issued on June

15, 2005, which anticipated the award of a new investment provider contract. Though Mr. Buck's email expressed Nationwide's apparent surprise and/or disappointment that it was not awarded the *new* investment provider contract, Nationwide had more than six months notice that the *existing* IP Contract and related annuity product contracts were, one way or the other, going to expire on December 31, 2005.

The transition to the new investment provider was anticipated to extend beyond December 31, 2005, a fact known to Nationwide as reflected in Mr. Buck's e-mail. The State asked Nationwide to execute a fifth amendment to the Renewal Agreement ("Fifth Amendment"). The proposed Fifth Amendment was identical to the Fourth Amendment, except that it reflected an extended term for the parties' "Agreement" through May 31, 2006, or such time as [the State] completes the RFP process and enters contracts with the new investment provider." The proposed Fifth Amendment also amended Exhibit A to provide that "[e]ffective January 1, 2006 through May 31, 2006, as long as the Lehmann Baa Credit Index is below 8.00%, no MVA would apply." The proposed Fifth Amendment was provided to Nationwide at or near December 20, 2005, along with an eighth amendment to the TPA Contract between NRS and the State, which also extended the expiration date of the TPA Contract from December 31, 2005, to May 31, 2006.

### Activity of the Parties after December 31, 2005

After January 1, 2006, Nationwide continued to accept contributions into the variable annuity product and the fixed annuity product and continued to act as the investment provider for the two annuity products.

On January 17, 2006, Nationwide notified the State by email "of the intention of Nationwide with respect to the extensions of the currently lapsed Administrative Agreement [TPA Contract] and Renewal Agreement." Nationwide stated *"[a]s you are aware both of these agreements terminated on December 31, 2005."* (Emphasis added.) Nationwide agreed to execute the eighth amendment to the TPA Contract between NRS and the State but attached a letter with respect to the "Renewal Agreement." The letter, which is dated January 16, 2006, provided:

Nationwide does not intend to enter *into the extension of the Renewal Agreement* as you have provided in the proposed Fifth Amendment. Since the Renewal Agreement has expired, *the provisions contained within the underlying Annuity Contracts (APO–2272 and APO–2425) are now in effect in their entirety, without modification.*

(Emphasis added.)

On January 19, 2006, Michael N. Keathley, Commissioner of the State of Missouri Office of Administration, wrote Nationwide, and stated:

On December 2, 2005 the Missouri Office of Administration awarded the Third–Party Administrator's contract to CitiStreet LLC, effective June 1, 2006. This action terminates the State of Missouri's contracts with [NRS] as of the end of business on May 31, 2006.

The Missouri Office of Administration also awarded a contract to ING Life and Annuity Company to provide a fixed annuity product to the participants of the Missouri Deferred Compensation Plan. This action terminated the Deferred Contribution Commission and the State of Missouri fixed annuity contracts with

Nationwide Life Insurance Company and Prudential Insurance as of the end of business on May 31, 2006.

On May 15, 2006, Nationwide advised the State that a lump sum disbursement of the funds under the Fixed Contract as of April 28, 2006, would be subject to an MVA charge of $17,417,000 based on a Lehman Baa Credit Index of 6.18%. Nationwide advised that the MVA was subject to daily fluctuation.

The State responded on May 23, 2006, that no MVA should be withheld based on the parties' contractual agreement. The State threatened litigation if the funds held under the Fixed Contract were transferred by Nationwide less an MVA.

On May 31, 2006, Nationwide wrote the State and advised:

Nationwide has honored the amendment referenced in your correspondence [the Fourth Amendment] in good faith. *The amendment,* which was signed and accepted by both parties, *contained a clear expiration date* of December 31, 2005 and no extension was negotiated. *Upon expiration, the terms reverted to those contained in the original contract.*

(Emphasis added.) This was a different position from the one taken by Nationwide in its January 16, 2006 letter, where Nationwide had claimed that upon expiration of the Renewal Agreement, the two annuity product contracts remained in effect, without modification.

On June 2, 2006, Nationwide transferred a lump sum disbursement of the funds under the Fixed Contract to the new investment provider, ING. Nationwide withheld an MVA of $18,586,379.65. The MVA was calculated pursuant to the terms contained in the original contract.[5] At the

---

5. Nationwide admitted, in response to uncontroverted fact number 28 in the State's mo-

time the funds from the Fixed Contract were transferred, the Lehman Baa Credit Index was below 8.00%.

### The Litigation

On May 30, 2006, Nationwide filed a complaint against the State in the United States District Court for the Southern District of Ohio Eastern Division seeking a declaratory judgment. The complaint was subsequently dismissed. However, certain allegations by Nationwide in the complaint[6] are relevant to our analysis:

6. Effective June 1, 1996, Nationwide and [the State] entered into a contract resulting from a request for proposal that was successfully awarded to Nationwide (the "RFP Contract")....

7. *Pursuant to the RFP Contract, Nationwide offered a variable annuity product and a fixed annuity product* ("the Fixed Annuity Account") to [the State]. The controversy in this matter relates to the Fixed Annuity Account.

. . . .

17. The *RFP Contract contains several provisions allowing for the application of the MVA in the event there is a termination of the Fixed Annuity Account and a request for a lump sum withdrawal,* as opposed to a withdrawal over time.

. . . .

20. The exact same description of the MVA to be charged in the event of a lump sum withdrawal and the alternative choice of avoiding the MVA charge was repeated in the 'investment options'

section of the RFP Contract, Article IV, Section (B)(3); the description was repeated again in Section (B)(12)(b) and again in Section (B)(13)(b).

. . . .

26. On or about June 1, 2003, Nationwide and [the State] entered into a 'Third Amendment to the Renewal Agreement,' ... (the 'Third Amendment') whereby, among other things, the parties agreed to extend the term of the RFP Contract through May 31, 2004.

27. In *Section IV of the Third Amendment, the parties expressly considered the market value adjustment as described in the RFP Contract and modified the methodology for determining the amount of the MVA, which methodology is described in 'Exhibit A' to the Third Amendment.*

28. *The market value adjustment was addressed again in Section VII of the Third Amendment,* which again referenced the revised methodology described in 'Exhibit A' to the Third Amendment.

29. *In Section VIII of the Third Amendment, reference was again made to the market value adjustment* that would be charged in the event [the State] elected to receive a lump sum withdrawal from the fixed annuity contracts and again referenced the revised methodology in 'Exhibit A to the Third Amendment.

---

tion for partial summary judgment, that its May 31, 2006 letter stated that Nationwide was assessing an MVA *pursuant to the terms in the "original contract."* Nationwide's legal position in a lawsuit it filed on May 30, 2006, discussed *infra,* is also consistent with this admission.

6. The federal court complaint was before the trial court for its consideration in connection

with the parties' competing motions for summary judgment. Though allegations in an abandoned complaint or petition are not, typically, deemed to be judicial admissions, the allegations can nonetheless be considered along with other facts and circumstances. *DeArmon v. City of St. Louis,* 525 S.W.2d 795, 803 (Mo.App.1975).

30. On or about June 1, 2004, Nationwide and [the State] entered into a 'Fourth Amendment to the Renewal Agreement,' ... (the 'Fourth Amendment').

31. By virtue of the Fourth Amendment, the term of the RFP Contract was extended through December 31, 2005.

32 .... *the Fourth Amendment ... modified the calculation of the MVA, but only for the period June 1, 2004 through December 31, 2005.*

. . . .

48. After [the State] confirmed to Nationwide that it was electing to receive a lump sum payout of the Fixed Annuity Account, *Nationwide informed [the State] that, pursuant to the applicable provisions of the RFP Contract, the MVA charge would be approximately $18.8 million* ....

. . . .

52. *It remains Nationwide's position that under the terms of the RFP Contract repeatedly agreed to by [the State], Nationwide has the right to apply and enforce the MVA* in response to [the State's] termination of the Fixed Annuity Account and election to receive distribution of such assets in a lump sum payment.

### COUNT I—CLAIM FOR DECLARATORY RELIEF

. . . .

54. By virtue of the foregoing, *there is a justiciable controversy as to the rights and obligations of the parties to the RFP, as renewed and amended.*

. . . .

57. *Nationwide has complied with all of its contractual obligations under the RFP Contract as renewed and as amended.*

58. ... *Nationwide is entitled to relief in the form of a judgment declaring and confirming its rights under the RFP Contract as renewed and amended, including a declaration that it has the right to enforce the express terms of the MVA provisions* ... and that it has no obligation to [the State] to refrain from applying such a charge.

It was thus Nationwide's position in its federal complaint that the *original terms of the IP Contract permitted it to withhold an MVA* and that when the Renewal Agreement, as amended, expired on December 31, 2005, the parties reverted to their "original contract." This was the same position taken by Nationwide in its letter to the State dated March 31, 2006, a day after the federal litigation was filed. Notably, Nationwide did not take the position in its federal complaint that when the IP Contract expired on December 31, 2005, the two annuity product contracts (including the Fixed Contract) remained in effect, unmodified—the position Nationwide had taken in its January 17, 2006 letter to the State.

On December 21, 2006, the State filed a petition in the Cole County Circuit Court against Nationwide and NRS asserting six counts: Count I for breach of contract against Nationwide; Counts II and III both asserting claims for breach of the implied covenant of good faith and fair dealing against Nationwide; Count IV for breach of contract against NRS; Count V for breach of the implied covenant of good faith and fair dealing against NRS; and Count VI for breach of fiduciary duty against NRS.

The State filed a motion for partial summary judgment as to Counts I and II against Nationwide. The State's motion alleged as to Count I that the uncontroverted facts demonstrated that Nationwide breached its contract with the State (a)

because the parties continued to operate after January 1, 2006, and thus pursuant to the terms of the Fourth Amendment which did not permit an MVA; and (b) because Nationwide had no right to unilaterally attempt to modify the parties' contract to revert to the MVA provisions in the original contract, which had been "deleted and replaced" in the Third Amendment. The State's motion alleged as to Count II that the uncontroverted facts demonstrated that Nationwide breached an implied covenant of good faith and fair dealing by withholding notification of its intentions with respect to the Fifth Amendment until after January 1, 2006. Nationwide and NRS filed a joint cross-motion for summary judgment as to all six Counts asserted by the State.

The trial court entered its Judgment on February 26, 2010, denying the State's motion for partial summary judgment and granting Nationwide's and NRS's cross-motion for summary judgment. The trial court entered its Judgment in favor of Nationwide and NRS, and against the State, as to all relief prayed by the State in its Petition, and dismissed the State's action with prejudice.

The State appeals from the trial court's grant of summary judgment in favor of Nationwide on Counts I through III of its Petition, and in favor of NRS on Count IV of its Petition. The State has not appealed (and thus has accepted) the trial court's grant of summary in favor of NRS on Counts V and VI of its Petition. In addition to seeking reversal of the trial court's Judgment in favor of Nationwide and NRS on Counts I through IV of its Petition, the State also requests this Court to enter judgment in its favor and against Nationwide on Counts I and II of its Petition because the trial court erred in denying the State's motion for partial summary judgment.

### Standard of Review

"We review a trial court's decision to grant a summary judgment motion *de novo*." *C–H Bldg. Assocs., LLC v. Duffey*, 309 S.W.3d 897, 899 (Mo.App. W.D.2010). The burden is on the movant to show a right to judgment based on facts about which there is no genuine dispute. *ITT Commercial Fin. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 378, 382 (Mo. banc 1993). We view the record and reasonable inferences therefrom in the light most favorable to the non-movant. *C–H Bldg.*, 309 S.W.3d at 899 (citing *ITT Commercial*, 854 S.W.2d 371 at 376). The propriety of summary judgment is purely a question of law and we need not defer to the trial court's decision to grant summary judgment. *ITT Commercial*, 854 S.W.2d at 376. However, if, as a matter of law, summary judgment is sustainable on any theory, even one entirely different from that addressed by the trial court, it should be sustained on appeal. *Bolivar Insulation Co. v. Bella Pointe Dev., L.L.C.*, 166 S.W.3d 610, 614 (Mo.App. S.D.2005).

The grant of a summary judgment is appealable, but only if the judgment disposes of all the parties and all of the issues. *Gunter v. City of St. James*, 91 S.W.3d 724, 726–27 (Mo.App. S.D.2002). "Generally, the denial of a summary judgment is not a final order and, therefore, is not appealable." *Estate of Downs v. Bugg*, 242 S.W.3d 729, 732 (Mo.App. W.D.2007) (citing *Penn–Am. Ins. Co. v. The Bar, Inc.*, 201 S.W.3d 91, 96 (Mo.App. W.D.2006)). However, the denial of a motion for summary judgment may be reviewed when its merits are completely intertwined with a grant of summary judgment to the opposing party. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 n. 1 (Mo. banc 2006). "We may direct in this posture, if proper, the judgment that the

court should have entered." *Transatlantic Ltd. v. Salva*, 71 S.W.3d 670, 676 (Mo.App. W.D.2002); *see,* Rule 84.14; *Redpath v. Mo. Highway & Transp. Comm'n*, 14 S.W.3d 34, 41 (Mo.App. W.D. 1999).

The issues raised in the State's partial motion for summary judgment addressing Counts I and II of its petition are completely intertwined with the grounds asserted by Nationwide to support its request for summary judgment on Counts I and II of the State's petition. We will, therefore, address the State's claims that the trial court erroneously denied its motion for partial summary judgment.

## Analysis

### *Summary of the State's Points Relied On*

The State asserts five points relied on. In point one, the State contends that the IP Contract as amended remained the operative agreement between the parties after December 31, 2005, as they continued to operate as they had prior to January 1, 2006, and that as a result, the undisputed facts support a finding that the IP Contract did not authorize Nationwide to withhold an MVA. In point two, the State contends the trial court erroneously concluded that the Fixed Contract survived the expiration of the IP Contract and independently permitted Nationwide to withhold an MVA. In point three, the State contends that the undisputed facts support a finding that Nationwide breached the implied covenant of good faith and fair dealing by unilaterally attempting to resurrect "deleted and replaced" MVA provisions from the IP Contract. Though couched. as a discussion of a claim of breach of the implied covenant of good faith and fair dealing, point three was discussed in the context of a breach of contract claim in the State's motion for partial summary judgment. We find this to be a distinction without meaning. The arguments raised by the State in its points one, two, and three relate collectively to the central issue in this case—what was the nature of the contractual relationship between the parties as of June 2, 2006, when Nationwide withheld an MVA, and did that relationship permit Nationwide to withhold an MVA?

The parties agree that there are no genuine issues of material fact in dispute preventing the entry of judgment as a matter of law resolving this central issue.[7] Because we determine as a matter of law that the trial court erroneously concluded that the contractual relationship between Nationwide and the State entitled Nationwide to withhold an MVA on June 2, 2006, the State's points one, two, and three are dispositive of this case, rendering discussion of points four and five unnecessary.[8]

### *Points I, II, and III*

The State's first, second, and third points relied on require us to determine the terms of the contract in existence be-

---

7. The State does contend that genuine issues of fact are in dispute regarding the manner in which the MVA withheld by Nationwide was calculated, an argument pled in the alternative to the State's primary claim that, as a matter of law, Nationwide was not entitled to withhold an MVA.

8. In Point Four, the State contends that *if* Nationwide had the legal right to withhold an MVA adjustment, there are genuine issues of material facts in dispute regarding the manner in which the MVA was calculated. In Point Five, the State contends that the undisputed facts show that NRS breached its third party administrator contract with the State by failing to procure a timely extension of the IP Contract from Nationwide. As will be seen, both issues are rendered moot by our holding in this Opinion.

tween the State and Nationwide on June 2, 2006, the date the State's Fixed Contract funds were transferred by Nationwide subject to the withholding of an $18,586,379.65 MVA. It is uncontested that Nationwide had no authority to withhold an MVA from the State's Fixed Contract funds *unless permitted by contract to do so.*

Nationwide has, over the course of its dispute with the State, asserted three separate (and inconsistent) "theories" to support its claim that its agreement with the State as of June 2, 2006, permitted it to withhold an MVA from the State's Fixed Contract funds. First, Nationwide has contended that as of December 31, 2005, the Renewal Agreement and its amendments expired, terminating the IP Contract but leaving the Fixed Contract in effect and independently enforceable.[9] This claimed legal basis for the trial court's Judgment is addressed in the argument portion of the State's first and second points relied on. The trial court's conclusions of law do not expressly hold that Nationwide's right to withhold an MVA was a function of the survival of the Fixed Contract following expiration of the IP Contract. However, the Judgment does express the trial court's factual finding "that the Fixed Contract had no stated durational term. Rather, the State agreed that it would continue until the Fixed Contract was terminated and the State received all payments due it thereunder." This factual finding could be argued to support an alternative basis for the trial court's Judgment that the Fixed Contract survived the IP Contract's expiration. Be-

cause we would be obliged to affirm the trial court's grant of summary judgment if sustainable on this ground, we must address the validity of this legal theory. *Bolivar Insulation Co.,* 166 S.W.3d at 614.

Second, Nationwide has contended that the expiration of the Renewal Agreement and its amendments on December 31, 2005, had the effect of resurrecting the original terms of the IP Contract, which terms permitted Nationwide to withhold an MVA.[10] This claimed legal basis for the trial court's Judgment is addressed in the argument portion of the State's first and third points relied on. The trial court's Judgment did not address this legal basis for Nationwide's claimed right to withhold an MVA. Moreover, the Judgment reflects no factual findings lending tacit support to this theory. However, during oral argument, Nationwide argued that this "theory" provided an alternative legal basis for the trial court's Judgment, requiring us to address its validity. *Id.*

Third, Nationwide has contended that its letter to the State dated January 16, 2006, and Michael Keathley's January 19, 2006 letter in response, formed a new contract where Nationwide and the State agreed to operate under the Fixed Contract from January 1, 2006, until May 31, 2006. Nationwide thus argues that it was permitted to withhold an MVA pursuant to Article 6.2 in the Fixed Contract.[11] This claimed legal basis for the trial court's Judgment is addressed in the argument portion of the State's first and second points relied on. The trial court's Judgment expressly concluded that a new

9. This is the position Nationwide took in its January 16, 2006 letter to the State.

10. This is the position that Nationwide took in its March 30, 2006 declaratory judgment lawsuit filed in federal court and in its March 31, 2006 letter to the State.

11. This is the position taken by Nationwide in its proposed findings of fact and conclusions of law and is thus the legal conclusion adopted by the trial court in its Judgment to support entering judgment in favor of Nationwide on Count I, the State's breach of contract claim.

agreement was formed based upon these communications, and the trial court entered judgment in favor of Nationwide on Count I of the State's Petition because the Fixed Contract the parties' agreed to operate under permitted an MVA to be withheld.

Finally, the State claimed in its motion for partial summary judgment (and in its first point relied on) that by continuing to operate as they always had from and after January 1, 2006, the State and Nationwide did so pursuant and subject to the terms of an implied contract identical to the terms of the IP Contract as modified through the Fourth Amendment. Nationwide vehemently contests that it was operating pursuant to an implied contract with the State with terms identical to those it rejected upon rejection of the Fifth Amendment. The trial court concluded as a matter of law that the conduct of the parties from and after January 1, 2006, was not consistent with an implied contract to operate pursuant to the terms of the IP Contract as amended through the Fourth Amendment.

### Theory One—Fixed Contract Automatically Survived the Expiration of the IP Contract

Nationwide asserts that the Fixed Contract signed on March 1, 1999, was intended to be a separate contract from the IP Contract, such that the IP Contract did not control its terms. Nationwide thus contends that when the IP Contract expired by its terms on December 31, 2005, the Fixed Contract, which did not have a durational term, continued in effect and expressly permitted an MVA to be withheld pursuant to Article 6.2. In addition, Nationwide argues that the State never provided the notice necessary to terminate the "independent" Fixed Contract. We disagree.

"'The interpretation of a contract is a question of law.'" *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.*, 126 S.W.3d 820, 825 (Mo.App. W.D. 2004) (citation omitted). "The primary rule in interpreting a contract is to ascertain the parties' intent and give effect to that intent." *Id.* (citing *SD Invs., Inc. v. Michael–Paul, L.L.C.*, 90 S.W.3d 75, 81 (Mo.App.2002)). To ascertain the parties' intent, "this court is to rely on the plain and ordinary meaning of the words in the contract and 'consider the document as a whole.'" *Id.* (quoting *SD Invs., Inc.*, 90 S.W.3d at 81)

> It is often necessary to consider not only the contract between the parties, but subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties.

*Knob Noster R–VIII Sch. Dist. v. Dankenbring*, 220 S.W.3d 809, 816 (Mo.App. W.D.2007) (quoting *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995)).

In the RFP, PART A: REQUEST FOR PROPOSAL provided that Nationwide, by placing a check mark next to the variable annuity product and fixed group annuity product and by signing PART A, agreed *"to furnish products described above in accordance with the provisions in the attached proposal."*

Paragraph III.A.4 of the RFP (and thus of the IP Contract) expressed the agreement between Nationwide and the State that *"the contract* between the [State] and [Nationwide] *shall consist of* this Request for Proposal and amendment, attachments or exhibits thereto." The specimen annui-

ty product forms were attached as exhibits to Nationwide's response to the Request for Proposal, which response was accepted by the State.

The RFP specified terms and provisions that were to be made a part of the two annuity product contracts. Of particular import, paragraph III.A.1 required Nationwide to provide "proposals for . . . the products described in Section IV for a period of three years, commencing on June 1, 1996." Nationwide accepted this provision and, in its response, noted "the contract term" for the two annuity products it was presenting to the State for its use would "be for three years beginning June 1, 1996." This corresponded with PART B: NOTICE OF AWARD, where the State confirmed that it was awarding the RFP to Nationwide, and that "[t]his contract is effective June 1, 1996 for a period of three years."

■ The terms of the annuity product contracts were never separately extended unless deemed to have been amended by the Renewal Agreement, the Third Amendment, and the Fourth Amendment. Each of these agreements referred to the parties' "Agreement" in a manner that clearly included reference to the annuity product documents. The Renewal Agreement and each of its amendments were employed to amend specific provisions in the annuity product contracts, consistent with the intent to treat the IP Contract and the two annuity product contracts as a collective "Agreement." This intent did not change on March 1, 1999, when the form of the Fixed Contract was substituted from Form APO–2424 to Form APO–2425, an intent expressly evidenced by the Third Amendment's specific discussion of the substituted Fixed Contract by reference to Form APO–2425. Thus, by extending the term of the parties' "Agreement," the Third Amendment un-

ambiguously extended the stated term of the IP Contract and the annuity product contracts, including the Fixed Contract (APO–2425).

■ The unambiguous terms of the RFP clearly reflect that the parties "agreement" was collectively comprised of the RFP, as revised by Nationwide's response and Attachment A, and the two annuity product contracts. It is further apparent from the unambiguous terms of the RFP that the clear intention of the parties was to permit the State to use the two annuity product contracts *subject to the terms of the RFP.*

> Where the agreement of the parties is evidenced by several documents that refer to each other, are closely related, and constitute one complicated interdependent transaction, the meaning of those documents must be gleaned from the entire transaction and not simply from isolated portions of a single document. Further, while it does not necessarily follow that instruments made at the same time and relating to the same subject constitute a single contract, such a determination should be made in light of the intention of the parties and with regard to the realities of the situation.

*Martin v. U.S. Fid. & Guar. Co.,* 996 S.W.2d 506, 510–11 (Mo. banc 1999) (footnote omitted). We conclude, as a matter of law, that the IP Contract and the two annuity product contracts formed a single contract.

Certainly, Nationwide's treatment of its relationship with the State is consistent with this conclusion. The December 13, 2005 internal email from Mr. Buck, a communication that occurred before Nationwide began its legal posturing with the State, clearly evidenced Nationwide's understanding that its "contract" with the State was a collective agreement, which included the IP Contract and the two an-

nuity product contracts, and that the "contract" was not going to be renewed, requiring Nationwide to disburse the funds held in the Fixed Contract. In Nationwide's declaratory judgment action filed on March 30, 2006, Nationwide alleged that the Fixed Contract entered into on March 1, 1999, repeated "the same description of the market value adjustment that had been repeatedly stated in the RFP Contract." Nationwide then alleged that after the State advised of its intent to withdraw the Fixed Contract funds by lump sum, "Nationwide informed [the State] that, *pursuant to the applicable provisions of the RFP Contract,* the MVA charge would be approximately $18.8 million." Nationwide *did not* allege that it was entitled to an MVA based on the separately enforceable terms of the Fixed Contract signed on March 1, 1999. Instead, Nationwide sought a declaration that it had a right to enforce the MVA provisions *"under the RFP Contract,"* evidencing Nationwide's recognition that its "contract" with the State collectively encompassed the IP Contract and the annuity product contracts. *Ackerman v. Globe–Democrat Pub. Co.,* 368 S.W.2d 469, 477 (Mo.), *cert. denied,* 375 U.S. 949, 84 S.Ct. 353, 11 L.Ed.2d 276 (1963) (holding that in construing a contract to determine the parties' intent, court should consider construction placed on the contract by the acts and conduct of the parties).

There is simply *no* factual or legal basis, therefore, for the trial court to have concluded that the Fixed Contract had no durational term. To the contrary, the existence of a durational term controlling the parties' "Agreement," which included the annuity product contracts, was unambiguous from the time the RFP was awarded through the Fourth Amendment. It is unambiguous that the parties' "Agreement" included the substituted form of

Fixed Contract. There are no controverted facts suggesting to the contrary.

We conclude as a matter of law that the parties' "Agreement" expired on December 31, 2005, by its express written terms. Thus, the IP Contract through the Fourth Amendment and each of the annuity product contracts, including specifically the Fixed Contract (APO–2425), expired on December 31, 2005.

Nationwide's contention that the State never "terminated" the Fixed Contract in accordance with its terms (which required, pursuant to paragraphs IV.B.12 and IV.B.13 as amended in the Third Amendment, ninety days written notice to terminate) is not relevant to the circumstances before us. Nationwide confuses the provisions of the RFP, which address *termination* of the parties' "Agreement," with the provisions of the RFP which address *expiration* of the term of the parties' "Agreement." The RFP frequently distinguished between these distinct legal means by which a contractual relationship may end.

In paragraph III.A.6, the RFP discussed the ramifications of *termination for cause.* In paragraph III.A.7, the RFP discussed the ramifications of *expiration* of the term of the contract. In response to both paragraphs, Nationwide's bid response (which was accepted by the State) provided that the State's election to withdraw funds in a lump sum might result in an MVA depending on the method of withdrawal. Paragraphs IV.B.12 and IV.B.13 discussed either Nationwide's or the State's right to terminate the "contract." Again, in response to both paragraphs, Nationwide discussed the potential for withholding an MVA in the event the State withdrew its funds in the Fixed Contract in a lump sum. Paragraphs III.A.7, IV.B.12, and IV.B.13 were each amended by the Third Amendment. Paragraph III.A.7 was amended to provide that "upon *expiration of the con-*

*tract term,* the State may direct ... the amounts held under the [Fixed Contract] be withdrawn in a lump sum."[12] The State was only obliged to advise at least ninety days before the *expiration* of the contract term that it did not intend to renew. It did so when, as Nationwide was aware, the State re-let the contract for bid by the new RFP issued in June 2005. Paragraphs IV.B.12 and IV.B.13 were amended by the Third Amendment to require the State to provide ninety days written notice to Nationwide to terminate the Fixed Contract. Precisely the same language appearing in the RFP's and in the Third Amendment's discussion of paragraphs IV.B.12 and IV.B.13 appears in the Fixed Contract (APO–2425). Notably, the Fixed Contract contains no language addressing its term, or the natural expiration of its term, as those provisions were supplied by Part III of the RFP/IP Contract, the section generally entitled "CONTRACTUAL REQUIREMENTS."

■ Clearly, the parties understood the difference between, and the independent legal significance of, the natural expiration of their contract term and termination of their contract at a point other than its natural expiration with due notice. Lest there be any doubt on the subject, paragraph III.A.37 of the RFP, addressed in Attachment A, asked Nationwide to confirm that it would "assist [the State] to ensure an orderly transfer of responsibility and/or the continuity of those services required under the terms of the contract to an organization designated by [the State], if requested in writing, *upon expiration*

*and/or termination* of the contract."[13] Thus, the provisions of the Fixed Contract (provisions drawn straight from the RFP and again in the Third Amendment) addressing the notice required from the State to "terminate" the Fixed Contract simply have no relevance where, as here, the parties' contract expired by its terms. " 'A contract covering a certain period of time, will remain effective the full term, unless the condition of termination is fully complied with.' " *Hawkinson v. Johnston,* 122 F.2d 724, 732 (8th Cir.), *cert. denied,* 314 U.S. 694, 62 S.Ct. 365, 86 L.Ed. 555 (1941) (quoting *Home Ins. Co. v. Hamilton,* 143 Mo.App. 237, 128 S.W. 273, 274 (1910)).

At oral argument, Nationwide contended that the Fixed Contract could not have a fixed term. Nationwide argued that the manner in which it is required to pay-out funds necessitates a "time-frame" within which to wind up its obligations that would be inconsistent with a fixed term. We can perceive no merit to this position. Whether the Fixed Contract expired of its own accord on a date certain or because of the State's election to exercise its right to otherwise terminate the Fixed Contract on ninety days written notice, Nationwide was faced with the same pay-out obligations and with an equivalent opportunity to prepare to satisfy those obligations.

■ We conclude as a matter of law that the trial court could not have found, given the unambiguous language in the parties' contract, that the Fixed Contract did not have a durational term or that the Fixed Contract automatically survived the

---

12. We note, as an aside, that unless the word "contract" here means the collective agreements of the parties, including the IP Contract and the Fixed Contract, the subsequent discussion of the right to withdraw funds held under the Fixed Contract upon expiration of the "contract" term would be nonsensical.

13. This provision, and Nationwide's response thereto, have independent significance in connection with the State's argument that the parties' contract in existence as of December 31, 2005, continued as the implied contract of the parties.

expiration of the IP Contract on December 31, 2005. Based on the unambiguous language of the parties' contract, there is no evidence that the State *ever* agreed to use Nationwide's fixed annuity product *EXCEPT* under the auspices of the RFP and the IP Contract.

The trial court could not, therefore, have based its decision to grant judgment in favor of Nationwide on Count I of the State's Petition on the automatic survival of the Fixed Contract following the expiration of the IP Contract. Stated differently, the trial court could not have concluded that Nationwide was entitled to withhold an MVA on June 2, 2006, from the State's lump sum withdrawal of the funds in the Fixed Contract based on the theory that the Fixed Contract automatically remained in effect, unmodified, from and after December 31, 2005.[14]

***Theory Two—the Expiration of the Renewal Agreement Resurrected the Original Terms of the IP Contract***

Nationwide next contends that when the Fourth (and final) Amendment to the Renewal Agreement expired by its terms on December 31, 2005, the original IP Contract was resurrected. Nationwide thus claims that the original MVA provisions set forth in paragraphs IV.B.12 and IV.B.13 of the RFP permitted it to withhold an MVA on June 2, 2005. We disagree.

Nationwide's argument necessarily presumes that the expiration of the Renewal Agreement and its amendments was legally distinguishable from the expiration of the parties' "Agreement." Nationwide points to no language in the IP Contract, in the Renewal Agreement, or in any of the amendments to the Renewal Agreement supporting such a conclusion. In fact, the Renewal Agreement and its amendments expressly indicate the contrary. The Renewal Agreement and its amendments repeatedly extended the term of the parties' Agreement and noted that, ***but for the amendment,*** the Agreement was set to expire on a stated date. The Renewal Agreement and each of its amendments "deleted and replaced" provisions in the original IP Contract with newly agreed upon provisions. The Renewal Agreement and its amendment each noted that ***except*** as indicated in the amendment, the Agreement remained in force and effect.

It is illogical to suggest that the parties employed the Renewal Agreement and its amendments to extend the stated durational term of the parties' Agreement and to delete and replace terms of that Agreement, only to intend that the Agreement would assume a perpetual duration in its original unmodified form once the Renewal Agreement as amended expired. Nationwide cites to no language in the parties' Agreement evidencing this intent and to no legal authority supporting construction of the parties' Agreement in such a fashion.

To the contrary:

[a]n agreement, when changed by the mutual consent of the parties, becomes a new agreement. Such new agreement ***takes the place of the old*** and determines the rights of the parties to the new agreement. In such case, the agreement between the parties consists of the new terms and as much of the old agreement as the parties have agreed will remain unchanged.... The repudia-

14. As noted, supra, the Judgment does not reflect that the trial court based its decision to grant judgment in favor of Nationwide on Count I of the State's Petition on the theory that the Fixed Contract automatically sur- vived the expiration of the IP Contract, though the Judgment contains an erroneous finding of fact that would have been consistent with this theory.

tion and cancellation of a substituted contract *will not revive* the former contract.

17A CJS Contracts section 408 (1999).

Similarly, the court in *Smith v. Githens,* 271 S.W.2d 374, 379–80 (Mo.App.1954) observed:

It is entirely competent for the parties to a contract to modify or waive their rights under it and engraft new terms upon it. The parties to a contract ordinarily are as free to change it after making it as they were to make it in the first instance, notwithstanding provisions in it designed to hamper such freedom. For instance, the time fixed for performance or payment may be enlarged by subsequent agreement. A subordinate and separable part of the contract may be waived or modified by the parties without a cancellation or avoidance of the whole contract. To be effective as a modification, the new agreement must possess all the elements necessary to form a contract.... Moreover, the assent of both parties to a modification is necessary. Such consent is required to vary a contract as much as to make one originally.

(quoting 12 Am.Jur. Sec. 427 p. 1004).

The State has construed Nationwide's attempt to rely on the original RFP MVA provisions as the basis for withholding an MVA on June 2, 2006, as an attempt to unilaterally modify the parties' contract in breach of the parties' contract. Nationwide has not been so bold as to characterize its legal position as a unilateral amendment of the parties' contract. We do note, however, that Nationwide's response to paragraphs IV.B.12 and IV.B.13 of the original RFP each provided, in the discussion involving the State's right to make a

lump sum withdrawal of the amounts held under the Fixed Contract, as follows:

[Nationwide] may amend the Annuity Contract(s) when, in the opinion of [Nationwide], an amendment is necessary to protect [Nationwide] from adverse financial impact due to any amendment to or modification of the Plans, changes in the administrative practices adhered to by the Plans, changes in Investment Options offered by the Plans, or the action of legislative, judiciary, or regulatory body which impacts the Annuity contract(s).

This language was expressly deleted and replaced, however, in the Third Amendment as follows:

[Nationwide] may amend the Annuity Contract(s) when, in the opinion of [Nationwide], an amendment is necessary to protect [Nationwide] from adverse financial impact due to an amendment to or modification of the Plans, changes in administrative practices adhered to by the Plans, changes in Investment Options offered by the Plans, or the action of legislative, judiciary, or regulatory body which impacts the Annuity Contract(s).

*Such amendment shall not be effective until [Nationwide] provides written notice to the State of [Nationwide's] intent to amend the Annuity Contract(s) and the State provides its consent, such consent shall not be unreasonably withheld by the State.*

Thus, if Nationwide intended the directive in its letter to the State dated May 31, 2006, that "[u]pon expiration [of the Renewal Agreement as amended through the Fourth Amendment] the terms reverted to those contained in the original contract"[15] as a unilateral amendment of the parties'

**15.** This was the same theory asserted by Nationwide in the declaratory judgment action filed on May 30, 2006, wherein Nationwide argued the original terms of the RFP permitted it to withhold an MVA and should be enforced.

contract, the attempt had no legal effect. Nationwide clearly did not have the State's consent to amend the contract in this fashion as required.

■ Nationwide concedes that the Renewal Agreement and each of its amendments expired on December 31, 2005. We conclude that the unambiguous language of the IP Contract, the Renewal Agreement, and each of its amendments reflect the parties' clear intent that the expiration of the Renewal Agreement as amended marked the natural expiration of the parties' "Agreement." Moreover, and in any event, the original provisions of the RFP addressing an MVA had been permanently deleted and replaced by the provisions addressing an MVA in the Third and Fourth Amendments, rendering Nationwide's reliance on those provisions to justify its withholding of an MVA illusory.

The trial court could not, therefore, as a matter of law, have supported its entry of judgment in favor of Nationwide on Count I of the State's Petition on the theory that the original MVA provisions in the IP Contract were resurrected upon the expiration of the Renewal Agreement as amended through the Fourth Amendment. Stated differently, the trial court could not have concluded that Nationwide was entitled to withhold an MVA on June 2, 2006, from the State's lump sum withdrawal of the funds in the Fixed Contract based on the theory that the original MVA provisions were automatically resurrected after December 31, 2005.[16]

*Theory Three—the State and Nationwide Reached a New Agreement Reflected by their January, 2006 Correspondence*

We are left with Nationwide's third and final theory—that the State and Nationwide entered into a new agreement to operate under the Fixed Contract evidenced by two letters exchanged between the State and Nationwide in January, 2006. Nationwide did not advance this theory until well after it withheld an MVA and until well after the State filed its lawsuit. Yet, this is the legal theory that was expressly adopted by the trial court as its basis for entering judgment in favor of Nationwide on Count I of the State's Petition—a result that is not surprising as the trial court's Judgment represents nothing more than the wholesale adoption of Nationwide's proposed findings of fact and conclusions of law. We conclude that the trial court erroneously held that the January 16, 2006 letter from Nationwide to the State and the January 19, 2006 letter from Michael Keathley to Nationwide formed a new contract.

The trial court made a finding of fact that "based upon the foregoing correspondence exchanged between the State and Nationwide ..., the parties agreed they would continue to operate under the Fixed Annuity Contract through May 31, 2006." The trial court then held in its conclusions of law, after referring to these two letters, that:

> There is no genuine dispute that the parties agreed, subsequent to December 31, 2005, to be governed by the Fixed Contract as opposed to the terms of the expired IP Contract. Thus, there is no evidentiary support for [the State's] claim that the parties, through their conduct, agreed to operate under the terms of the expired IP Contract where their own correspondence confirmed an

16. As noted, *supra*, the trial court did not rely on this theory to support its entry of judgment in favor of Nationwide on Count I of the State's Petition, though the theory was advanced as an alternative basis for the trial court's Judgment by Nationwide during oral argument.

agreement to operate under the Fixed Contract.

The trial court's "finding of fact" and "conclusion of law" each involved the trial court attaching legal significance to the two letters exchanged in January 2006. The trial court relied on no other "uncontroverted facts" other than the language in the letters themselves to reach the conclusion that the letters constituted an enforceable contract. The trial court's determination that the letters formed a contract is a conclusion of law we review *de novo*. *Crestwood Shops, LLC v. Hilkene,* 197 S.W.3d 641, 656 (Mo.App. W.D.2006) ("Interpretation of a contract is a question of law and is subject to *de novo* review.").

 The elements required to form a valid contract in Missouri are "offer, acceptance, and bargained for consideration." *Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo. banc 1988). Nationwide apparently contends that its January 16, 2006 letter, which rejected the State's request that it enter into the Fifth Amendment, was instead an "offer" to continue to operate under the Fixed Contract. We disagree. The letter merely expressed Nationwide's unilateral opinion (at that time, anyway) that because "the Renewal Agreement had expired, the provisions contained within the underlying Annuity Contracts (APO–2272 and APO–2425) are now in effect in their entirety, without modification." Nationwide did not "offer" anything by this unilateral statement. At best, the letter expressed Nationwide's opinion that the Fixed Contract *had not expired.* It is inherently inconsistent, therefore, to characterize the letter as an offer to enter into a new agreement. "[A]n offer must be definite and has been 'made when the offer leads the offeree to reasonably believe that an offer has been made.'" *Walker v. Rogers,* 182 S.W.3d 761, 767 (Mo.App. W.D.2006) (quoting

*Volker Court, LLC v. Santa Fe Apartments, LLC,* 130 S.W.3d 607, 611 (Mo.App. W.D.2004)). According to the RESTATEMENT (SECOND) OF CONTRACTS, section 24 (1981), "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Nationwide's January 16, 2006 letter does not satisfy this standard.

 Even if Nationwide's January 16, 2006 letter could be construed as an offer, we cannot conclude that Mr. Keathley's January 19, 2006 letter constituted an "acceptance." Nationwide was aware that the State employed an RFP process to select investment providers, having successfully bid the 1995 RFP and having unsuccessfully bid the 2005 RFP. Nationwide offered no uncontroverted facts to the trial court which would support a legal conclusion that Nationwide had any reason to expect or believe that Mr. Keathley could summarily "accept" an offer to create an interim agreement with Nationwide which would serve in the stead of the parties' expired contract until the Fixed Contract funds could be transferred to the new investment provider. Even without this concern, it is evident from the face of Mr. Keathley's letter that he accepted nothing. Mr. Keathley's letter said, in pertinent part:

> On December 2, 2005 the Missouri Office of Administration awarded the Third–Party Administrator's contract to CitiStreet LLC, effective June 1, 2006. This action terminates the State of Missouri's contracts with [NRS] as of the end of business on May 31, 2006.
>
> The Missouri Office of Administration also awarded a contract to ING Life and Annuity Company to provide a fixed annuity product to the participants of the Missouri Deferred Compensation Plan.

This action terminated the Deferred Contribution Commission and the State of Missouri fixed annuity contracts with Nationwide Life Insurance Company and Prudential Insurance as of the end of business on May 31, 2006.

Nothing in this factual recitation can be fairly read to rise to the level of "acceptance" of a purported "offer" to continue operating with Nationwide on the basis of a new agreement defining the terms of the parties' contract as those set forth in the Fixed Contract. "A contract requires an unequivocal and 'mirror-image' acceptance." *Walker*, 182 S.W.3d at 768 (citing *Volker Court, LLC,* 130 S.W.3d at 611). According to the RESTATEMENT (SECOND) OF CONTRACTS, section 50(1) (1981), "[a]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Mr. Keathley's letter does not acknowledge Nationwide's January 16, 2006 letter. There is nothing in the letter which suggests either an awareness that an offer was extended by Nationwide's letter or the intent to accept any such offer. By its express terms, Mr. Keathley's letter appears to "cover the base" of providing notice of *termination* in the manner that would have been required by the IP Contract as amended by the Third Amendment but for the fact the parties' contract had already *expired* by its terms on December 31, 2005. The letter was at best superfluous and, in any case, was not legally sufficient to constitute an "acceptance" of an "offer" to enter into a new agreement, particularly where no such offer had been extended.

▮▮▮▮ Finally, even if the two letters could somehow be read as an offer and acceptance, we would conclude as a matter of law that no contract was formed because of the absence of consideration. Acceptance of a unilateral demand in the absence of consideration does not bind the acceptor contractually. " 'Consideration' . . . generally consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party." *Morrow v. Hallmark Cards, Inc.,* 273 S.W.3d 15, 25 (Mo.App. W.D.2008). It is an elemental principle of contract law that a contract "that contains mutual promises imposing some legal duty or liability on each promisor is supported by sufficient consideration to form a valid, enforceable contract." *Sumners v. Serv. Vending Co.,* 102 S.W.3d 37, 41 (Mo.App. S.D.2003).

We must consider the legal posture of the parties as of January 1, 2006. Their collective written contract (the IP Contract and both annuity product contracts) expired on December 31, 2005. ***Thus, as of January 1, 2006, Nationwide had no contractual right from any source to withhold an MVA.*** Nationwide was more compelled than anyone to orchestrate an "agreement" with the State which would permit it to withhold an MVA, having learned when the State issued the new RFP that the parties' contract would be expiring on December 31, 2005, and having learned after it bid the new RFP that the new contract had been awarded to someone else. Nationwide knew that a mere extension of the contract it had in place with the State until the transition to ING would leave it in the same position it was in with no contract—that is, with no right to withhold an MVA, given the level of the Lehman Baa Credit Index. Nationwide also knew that it had, in the Third Amendment, negotiated away the right to unilaterally amend its contract with the State "where in the opinion of [Nationwide] an amendment is necessary to protect [Nationwide] from adverse financial impact." Ironically, notwithstanding Nationwide's efforts before the trial court and on this appeal to chastise the State for failing to

protect its interests, it is Nationwide, and not the State, which suffered from having failed to ensure that it had a contractual agreement in place with the State from and after January 1, 2006, permitting it to withhold an MVA.

Seeking an otherwise non-existent avenue to recover an MVA, Nationwide was apparently motivated to set about to posture a scenario which would afford it the opportunity to argue that it had a contractual relationship with the State "authorizing" an MVA at the time of transfer of funds to ING. It was in this context that Nationwide, in its January 16, 2006 letter, (a) communicated its rejection of the Fifth Amendment to the State after the parties' contract had expired, and (b) unilaterally declared that the Fixed Contract survived the expiration of the Renewal Agreement. If, as Nationwide now argues, this letter was an "offer" to form a new contract, it was an offer that, if accepted, would have afforded Nationwide the substantial benefit of a right it otherwise did not have—the right to withhold an MVA in excess of $18,000,000 upon transfer of the Fixed Contract funds to ING. We have searched Nationwide's January 16, 2006 letter for any sign or semblance of consideration offered by it attendant to such a benefit. We have found none.

Moreover, we can conceive of no "consideration" that the State would or could have received (and, more importantly, none is argued by Nationwide to exist in its uncontroverted facts) by accepting Nationwide's "offer." The State received nothing in exchange for its alleged acceptance of Nationwide's offer to continue operating under the Fixed Contract, a purported acceptance which permitted Nationwide to withhold more than $18,000,000 as an MVA when it otherwise would not have been permitted to withhold an MVA. Nationwide has not argued

that the State received consideration for the purported "new contract" in the form of having the benefit of Nationwide's assistance during the transition to ING. Nationwide would not have been successful had it made this argument. "A promise to carry out an already existing contractual duty does not constitute consideration." *Eiman Bros. Roofing Sys., Inc. v. CNS Int'l Ministries, Inc.*, 158 S.W.3d 920, 922 (Mo.App. W.D.2005). "'A promise to do that which one is already legally obligated to do cannot serve as consideration for a contract.'" *Wilson v. Midstate Indus., Inc.*, 777 S.W.2d 310, 314 (Mo.App. W.D.1989) (quoting *City of Bellefontaine Neighbors v. J.J. Kelley Realty & Bldg. Co.*, 460 S.W.2d 298, 301 (Mo. App.1970)). Nationwide already owed the contractual duty to the State to assist with the transition to a new investment provider. As we previously noted, paragraph III.A.37 of the RFP obligated Nationwide to "assist [the State] to ensure an orderly transfer of responsibility and/or the continuity of those services required under the terms of the contract to an organization designated by [the State], if requested in writing, *upon expiration and/or termination* of the contract." The June 2005 RFP could be construed as such a request from the State. Mr. Keathley's letter could be construed as such a request from the State. The point is not whether the State actually made such a written request, however. The point is that the State had the right to do so and, thus, did not require a "new contract" with Nationwide to facilitate the "orderly transfer of responsibility and/or the continuity of those services required under the terms of the contract" to ING upon expiration of the parties' contract on December 31, 2005.

Lest there be any doubt on this subject, it is apparent that Nationwide did not

contemporaneously believe that the January 2006 correspondence between the parties formed a new contract. Subsequent to its exchange of correspondence with the State in January 2006, Nationwide took the contrary and inconsistent position in its May 31, 2006 letter to the State, and in its May 30, 2006 declaratory judgment lawsuit, that the expiration of the Renewal Agreement and its amendments resulted in the resurrection of the original terms of the IP Contract, entitling Nationwide to a declaration that the original MVA provisions in the RFP permitted it to withhold an MVA. If Nationwide believed that it had formed a new contract with the State as of January 19, 2006, authorizing continued operation under the terms of the Fixed Contract, then Nationwide would not have needed to rely on a claim that the original IP Contract terms had been "resurrected." Moreover, Nationwide admitted, in response to uncontroverted fact number 28 in the State's motion for partial summary judgment, that its May 31, 2006 letter stated that Nationwide was assessing an MVA *pursuant to the terms in the "original contract."* Nationwide will not now be heard to inconsistently claim that it instead had a new contract with the State permitting an MVA represented by two letters exchanged between the parties in January 2006 after the original contract expired.

We conclude, as a matter of law, that the trial court erroneously afforded the January 2006 letters exchanged between Nationwide and the State the force and effect of a new contract. The January 2006 communications do not satisfy the essential elements of a contract and, thus, did not create a new contract or agreement which restored to Nationwide a legal right it lost as of December 31, 2005—the right to assess an MVA. We thus conclude that the trial court erroneously entered judgment in favor of Nationwide on Count I of the State's Petition. Stated differently, the trial court erroneously determined that Nationwide was contractually authorized to withhold an MVA because the State had agreed to permit the terms of the Fixed Contract to control the parties' continued operations from and after January 1, 2006.

### The State's Theory—the Parties Continued to Operate by Implication under the IP Contract as Amended

We have explored and rejected each of the alternative (and inconsistent) theories from time to time argued by Nationwide as the alleged basis for permitting a legal conclusion that it had an agreement in force and effect with the State as of June 2, 2006, which permitted it to withhold an MVA.

The State has argued that the contract in force and effect between the parties as of June 2, 2006, was the IP Contract as modified by the Fourth Amendment. The State claims that because Nationwide continued to accept participant contributions after December 31, 2005, notwithstanding the expiration of parties' contract by its terms, Nationwide necessarily accepted the benefits of the IP Contract (the fees it procured for serving as the investment provider) and thus impliedly agreed to continue operating under the IP Contract (as amended) through the date of transfer of the State's funds. Nationwide vehemently denies that the IP Contract as amended continued by implication to control the parties' duties and obligations following its express expiration on December 31, 2005. The issue of whether an expired contract continues to be in effect after its expiration is a question of law which we review *de novo. Guidry v. Charter Commc'ns, Inc.,* 269 S.W.3d 520, 527 (Mo. App. E.D.2008).

We believe the trial court correctly held that the parties never intended their con-

tract to continue in force and effect by implication following its expiration on December 31, 2005. We reach the same conclusion as the trial court, however, on alternative grounds from those articulated by the trial court.

We must accept the uncontroverted contention that the State, aware that the IP Contract as amended through the Fourth Agreement would expire on December 31, 2005, offered to renew the parties' contract as represented by the Fifth Amendment, an offer which was rejected. We must also accept Nationwide's uncontroverted factual contention that it did not want to continue operating under the IP Contract as amended through the proposed Fifth Amendment, a contention that is unequivocally supported by Nationwide's express rejection of the Fifth Amendment.[17] We cannot conclude that the parties had a "meeting of the minds" wherein they agreed to continue to do business under their expired contract as amended when an express offer to renew that contract subject to the terms described in the Fifth Amendment had been extended and rejected. *Cf. Guidry*, 269 S.W.3d at 528–30.

We are left, then, with the inescapable conclusion that the parties were no longer operating under an express contract between January 1, 2006, through June 2, 2006. Yet, it is uncontroverted that the parties continued to do business together. Nationwide continued to accept participant contributions and, presumably, to draw fees for its services as an investment pro-

vider from January 1, 2006, until June 2, 2006.

Based on the unambiguous language of the parties' expired contract, we conclude that the parties were operating from and after January 1, 2006, pursuant to paragraph III.A.37 of the parties' contract, which described Nationwide's *continuing obligation* to assist with the orderly transfer of responsibility to a new investment provider—an obligation which expressly *arose upon and following expiration of the parties' contract.*[18] Nationwide was not entitled to withhold an MVA on June 2, 2006, at the conclusion of the transition period because the parties' contract (and thus every contractual provision addressing the right to withhold an MVA) had expired, and because the parties had not agreed to permit Nationwide the right to withhold an MVA at the end of the transition period.

This is not a harsh, unfair, or even unanticipated result. Had issuance of the new investment contract anticipated by the June 2005 RFP been completed by December 31, 2005, Nationwide would have been required by the IP Contract as amended through the Fourth Amendment to permit the State to withdraw the funds held under the Fixed Contract in a lump sum with no MVA withheld, as the Lehman Baa Credit Index was below 8.00%. The transition to a new investment provider took longer than expected, a scenario envisioned by the parties' contract as evidenced by paragraph

---

**17.** The State acknowledges that this is Nationwide's position but claims that a contract should nonetheless be implied by Nationwide's continued acceptance of contributions into the annuity products after January 1, 2006. We have already observed that Nationwide was likely bound by paragraph III.A.37 to do exactly what it did from and after January 1, 2006, to assist in the "orderly transfer of responsibility and/or the continuity of those services required under the terms of the con-

tract to an organization designated by [the State]" after expiration of the parties' contract.

**18.** As previously noted, this provision also required Nationwide to ensure "continuity of services," explaining Nationwide's continued acceptance of participant contributions notwithstanding expiration of the parties' contract.

III.A.37. Had Nationwide desired to negotiate the right to withhold an MVA after expiration of its contract with the State, and following the conclusion of its post-expiration transition obligation, it should have sought to do so at the time the RFP was negotiated, or at the time of negotiation of the Renewal Agreement or any of its amendments. It did not do so.

The trial court's Judgment granting summary judgment in favor of Nationwide on Count I of the State's petition is erroneous as a matter of law. The State's points relied on one, two, and three, insofar as they address the theory of Nationwide's breach of contract, are granted.

***The Trial Court's Grant of Summary Judgment on Count II of the State's Petition—the Implied Covenant of Good Faith***

Count II of the State's petition claimed that Nationwide breached the implied covenant of good faith and fair dealing by waiting to communicate its decision that it would not sign the Fifth Amendment until after the parties' contract had expired and/or by unilaterally attempting to modify the parties' contract by assessing an MVA. The trial court granted Nationwide summary judgment on this Count. The State claims the trial court committed error, an issue addressed in the State's third point relied on.

The trial court's grant of summary judgment in favor of Nationwide on Count II of the State's petition was based on the trial court's erroneous conclusion that the Fixed Contract independently permitted Nationwide to withhold an MVA. Notwithstanding, we affirm the trial court's entry of summary judgment on Count II of the State's petition on an alternative legal theory. *Bolivar Insulation Co.,* 166 S.W.3d at 614.

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr.,* 977 S.W.2d 266, 271 (Mo. banc 1998). An implied covenant will not, however, be imposed where the parties expressly address the matter at issue in their contract. *See Crestwood Plaza, Inc. v. Kroger Co.,* 520 S.W.2d 93, 98 (Mo. App.1974); *Conservative Fed. Savings & Loan Ass'n v. Warnecke,* 324 S.W.2d 471, 479 (Mo.App.1959). Here, the State and Nationwide expressly defined the term of their agreement. There is no authority for the proposition that a party has an implied duty of good faith and fair dealing to agree to renew a contract that is set to expire by its negotiated terms.

Though the State has construed Nationwide's position that the original RFP provisions survived expiration of the Renewal Agreement as a bad faith attempt to unilaterally modify the parties' contract, we do not so conclude. Rather, it seems Nationwide has simply explored, albeit unsuccessfully, the gamut of potential "legal theories" which might have permitted it an avenue to avoid the predicament of having no contract with the State permitting it to withhold an MVA.

We affirm, therefore, the trial court's grant of summary judgment in Nationwide's favor on Count II of the State's petition, though on the alternative legal grounds herein stated. Correspondingly, the State's point relied on three to the extent it addressed the theory of implied covenant of good faith and fair dealing is denied.

***The State's Motion for Partial Summary Judgment on Counts I and II of its Petition***

The State has requested that we reverse the trial court's denial of the State's motion for partial summary judgment on Count I and II of its petition.

Because we have affirmed the trial court's entry of summary judgment in favor of Nationwide on Count II of the State's Petition, the State's request that we reverse the trial court's denial of its motion for partial summary judgment on Count II is denied.

With respect to Count I of the State's Petition, the parties have agreed that there are no genuine issues of material fact in dispute relating to the contracts they entered into, and/or the communications they exchanged. As a result, the parties have agreed that the only contested "issue" is the legal construction to be afforded their agreements and communications, a matter of law we review *de novo*. *Crestwood Shops, LLC,* 197 S.W.3d at 656.

The State's motion for partial summary judgment on Count I of its Petition against Nationwide is completely intertwined with the arguments advanced by Nationwide in its motion for summary judgment seeking judgment in its favor on Count I of the State's Petition. We are thus permitted to consider the State's claim that the trial court committed error in denying its motion for partial summary judgment on Count I. *Dhyne,* 188 S.W.3d at 456 n. 1.

We have concluded as a matter of law that the agreements and communications between the parties did not afford Nationwide the contractual right to withhold an MVA on June 2, 2006. We have concluded as a matter of law that the parties' operations from and after January 1, 2006, were pursuant to a provision of the parties' contract which survived, by its terms, the expiration of the parties' contract. That provision, paragraph III.A.37, did not permit Nationwide to withhold an MVA. Thus, Nationwide breached its obligation to assist in the orderly transfer of the funds held under the Fixed Contract by withholding money from that transfer on June 2, 2006.

As Nationwide did not have a contractual right to withhold an MVA from the State's lump sum withdrawal of funds held under the Fixed Contract as of June 2, 2006, it follows as a matter of law that the State was entitled to summary judgment in its favor and against Nationwide on Count I of its Petition asserting a claim for breach of contract. *See Transatlantic Ltd.,* 71 S.W.3d at 676; *Redpath,* 14 S.W.3d at 41. Pursuant to Rule 84.14, we are to give such judgment as the court ought to give.

We direct the entry of judgment in the State's favor and against Nationwide on Count I of the State's Petition in the principal amount of $18,586,379.65, plus interest thereon as required by section 408.020, RSMo 2000, at the statutory rate of 9% from and after June 2, 2006.

### The Effect of our Determination on Counts III and IV of the State's Petition

Our direction that judgment shall be entered in the State's favor on Count I of its Petition renders moot the relief sought by the State in Count III of its Petition (which alternatively claimed that if an MVA was appropriately withheld, it was calculated in error). Our direction that judgment shall be entered in the State's favor on Count I of its Petition also negates as a matter of law the relief sought by the State in Count IV of its Petition (which claimed that NRS breached the TPA Contract by not negotiating an extension of the IP Contract beyond December 31, 2005, on the State's behalf), a claim on which the State cannot establish any damage given our determination that the State is entitled to return of the inappropriately withheld MVA notwithstanding the absence of an extension of the parties' contract.

The trial court entered summary judgment in favor of Nationwide on Count III

based on its erroneous conclusion that Nationwide was entitled to withhold an MVA and on its conclusion that the MVA was properly calculated per the terms of the Fixed Contract. For reasons that are self evident, the trial court's entry of summary judgment in favor of Nationwide on Count III of the State's Petition is erroneous as a matter of law. We reverse the trial court's Judgment in this regard. However, we direct the entry of judgment dismissing Count III of the State's Petition as moot.

With respect to Count IV, the trial court found as a matter of law that because Nationwide was entitled to withhold an MVA under the Fixed Contract, NRS's claimed breach of contract in failing to secure an extension of the IP Contract did not result in any damage to the State. For reasons that are self evident, the trial court's entry of summary judgment in favor of NRS on Count IV of the State's Petition is erroneous as a matter of law. We reverse the trial court's Judgment in this regard. However, we direct the entry of judgment in favor of NRS and against the State on Count IV of the State's Petition for the alternative reason that the State has suffered no damage by NRS's alleged failure to secure an extension of the IP Contract.

### Conclusion

This matter is remanded to the trial court. The trial court is ordered to vacate its February 26, 2010 Judgment and to enter a new Judgment as follows:

Judgment shall be entered in favor of the State and against Nationwide on Count I of the State's Petition in the amount of $18,586,379.65, plus statutory interest thereon pursuant to section 408.020, RSMo 2000, at the rate of 9% per annum from and after June 2, 2006.

Judgment shall be entered in favor of Nationwide and against the State on Count II of the State's Petition.

Count III of the State's petition against Nationwide shall be dismissed with prejudice as moot.

Judgment shall be entered in favor of NRS and against the State on Counts IV, V, and VI of the State's Petition.

Costs shall be assessed to Nationwide.

All concur